HOUSTON, Justice
(dissenting).
Emily Seymore was found dead in her mobile home on December 20, 1992. At the time of her death, Ms. Seymore was over 60 years of age, had a blood alcohol content of approximately .266%, and had a history of health problems. Ms. Seymore’s body had already begun to decompose when it was discovered. Clemmie Seymore was found alive and gasping for breath in the same room with his wife Emily; however, he died shortly thereafter. Mr. Seymore, who was in his mid-60s, also had a history of health problems. The room in which the Seymores were discovered was extremely hot. The witness who discovered the Seymores described the temperature in the room as being like that in an enclosed automobile that has been exposed for an extended period to the summer sun — hot to the point of causing difficulty in breathing. Tests using infrared technology indicated that the surface temperatures in the area of the room where Ms. Seymore was found could have been between 140° and 150° F. and that the surface temperatures in the area where Mr. Seymore was found could have approached 120° F. The excessive heat within the mobile home was caused by a 40,000 BTU unvented gas space heater that had been operating on high for an undetermined time. The windows and doors of the mobile home were closed; the temperature outside was in the “upper 50s.” Because of Mr. Seymore’s cold-natured tendencies, it was not unusual for the Seymores to keep their mobile home uncomfortably hot throughout the year.
Multiple tests performed on the Seymores’ blood by state forensic toxicologist Laura Shevlin of the Alabama Department of Forensic Sciences were negative for the presence of “carboxyhemoglobin.”[2] According to Ms. Shevlin, the results of her tests did not indicate that the Seymores had died of carbon monoxide poisoning. At the defendants’ request, Ms. Shevlin provided them one-half of her remaining samples of the Seymores’ blood for farther independent testing.[3] The defendants submitted their blood samples for testing to National Medical Services, Inc. (“NMS”), an established medical testing laboratory in Pennsylvania. Dr. Robert Middle-berg, the director of forensic toxicology at NMS, telephoned the defendants’ attorney two days before the trial and discussed with him the fact that Mr. Seymore’s blood had tested positive for an insignificant level of carboxyhemoglobin. Dr. Middleberg further acknowledged that an initial test on Ms. Sey-more’s blood had suggested the presence of a significant level of carboxyhemoglobin at the time of her death. Dr. Middleberg explained, however, that the presence of a large concentration of decomposition products in the blood had distorted the result of the *230 initial test and, therefore, that the initial “false positive” result was scientifically incorrect. Dr. Middleberg told the defendants’ attorney that Ms. Seymore’s blood would be retested two days later. The defendants’ attorney immediately notified the plaintiffs’ attorney that Dr. Middleberg had found an insignificant level of carboxyhemoglobin in Mr. Seymore’s blood, but that he had not determined whether Ms. Seymore’s blood also contained the substance. The defendants’ attorney did not inform the plaintiffs’ attorney that the initial test performed by Dr. Middleberg on Ms. Seymore’s blood had produced a “false positive” result. NMS notified the defendants’ attorney on the first day of the trial that Ms. Seymore’s blood contained an insignificant level of carboxy-hemoglobin. This information, which strongly supported the defendants’ position that heat stroke, not carbon monoxide, had caused the Seymores’ deaths, was immediately relayed to the plaintiffs’ attorney. The parties proceeded to try the case. The plaintiffs presented the testimony of Dr. Joe Burton, a forensic pathologist, who testified that, in his opinion, the Seymores had died of carbon monoxide poisoning. Dr. Burton had nothing to say at the trial that was critical of the way in which Ms. Shevlin had received, tested, and stored the Seymores’ blood samples at her laboratory. Dr. Burton’s conclusion that the Seymores had died of carbon monoxide poisoning was based on his belief that any other conclusion “just [wouldn’t] add up.” In addition to the testimony of Ms. Shevlin and Dr. Middleberg that the Seymores had an insignificant (nonlethal) level of carboxyhem-oglobin at the time of their deaths, the defendants also presented the testimony of Dr. Kris Sperry, deputy chief medical examiner for the Fulton County medical examiner’s office in Atlanta, Georgia; his testimony supported their theory that the Seymores had not died of carbon monoxide poisoning. After considering all of the evidence, the jury found for the defendants.
The plaintiffs subsequently moved to compel the Alabama Department of Forensic Sciences to produce the remainder of the Seymores’ blood samples for further testing. The trial court granted that motion, and the plaintiffs sent the blood samples to Alabama Reference Laboratories, Inc., in Montgomery. A legal assistant to the plaintiffs’ attorney also contacted Dr. Middleberg by telephone. During this conversation, Dr. Middleberg discussed the tests that he had performed on Ms. Seymore’s blood, and he mentioned that he had conducted tests during the week before the trial. After Alabama Reference Laboratories had reported to the plaintiffs that the blood samples submitted to it had also revealed insignificant levels of carboxyhemoglobin (levels consistent with that of a tobacco smoker), the plaintiffs moved to compel the production of all the documents in the possession of Dr. Middleberg and NMS relating to NMS’s testing of the Seymores’ blood. The trial court granted the motion, and the plaintiffs learned of the “false positive” result obtained by Dr. Middleberg. The plaintiffs then moved for a new trial, arguing that the “false positive” test result was newly discovered evidence that probably would have changed the jury’s verdict if it had been presented during the trial. Dr. Middleberg testified during the hearing on the new trial motion, without contradiction, that the “false positive” result obtained from the first test conducted by NMS on Ms. Seymore’s blood was caused by decomposition products in the sample and that that result was confirmed to be scientifically incorrect. With this evidence before it, the trial court granted the plaintiffs’ motion for a new trial on the ground of newly discovered evidence.
Our standard of review in this case was succinctly stated in Weeks v. Danford, 608 So.2d 387, 388-89 (Ala.1992):
“The ruling on a motion for new trial is within the trial court’s discretion and will not be disturbed on appeal ‘unless some legal right was abused and the record plainly and palpably shows that the trial court was in error.’ Gold Kist, Inc. v. Tedder, 580 So.2d 1321, 1322 (Ala.1991) (citations omitted). In order to be entitled to a new trial on the ground of newly discovered evidence, the movant must show that the evidence was discovered after trial, that it could not have been discovered with due diligence prior to trial, that it is material to the issue and not merely *231 cumulative or impeaching, and that it is of such a nature that a different verdict would probably result if a new trial were granted. Talley v. Kellogg Co., 546 So.2d 385 (Ala.1989).”
The defendants concede that the “false positive” test result came to the attention of the plaintiffs after the trial. However, the defendants argue, among other things, that the evidence of the “false positive” result was not material to the issue concerning the car-boxyhemoglobin content of Ms. Seymore’s blood; was possibly relevant only for impeachment purposes; and was not sufficient to support the trial court’s finding that the presentation of the evidence to another jury would probably result in a verdict for the plaintiffs.
After carefully examining the record and the briefs, I can conclude only that the trial court abused its discretion in granting the plaintiffs a new trial on the ground of newly discovered evidence. The record clearly indicates that although a fact question was presented as to whether the Seymores had died from carbon monoxide poisoning or from heat stroke, there was more than ample evidence to support a finding that heat stroke was the cause of the Seymores’ deaths. Obviously impressive to the jury was the complete absence of any toxicological evidence suggesting that the Seymores had died of carbon monoxide poisoning. The record also clearly indicates that the evidence of the “false positive” test result obtained by Dr. Middleberg was discovered by the plaintiffs after the trial. Thus, the dispositive issue presented to the trial court was whether this evidence was material and justified allowing the plaintiffs the opportunity to present the evidence to a new jury.
The only witness to testify at the hearing on the new trial motion was Dr. Middleberg.[4] Dr. Middleberg testified that the “false positive” result obtained from the first test conducted by NMS on Ms. Seymore’s blood was unquestionably caused by decomposition products in the blood sample (the undisputed evidence showed that Ms. Seymore had died before Mr. Seymore died and that when her body was found she had been dead long enough for rigor mortis to set in) and that that result was subsequently confirmed to be scientifically incorrect. The plaintiffs presented no evidence to dispute Dr. Middle-berg’s testimony in this respect. It is quite obvious from my reading of the record that the intricacies of toxicological testing of the nature involved in this case are well beyond the knowledge and understanding of the average layman. The results of complicated blood tests do not stand alone, totally independent of the interpretations placed on those results by the individuals possessing the expertise to evaluate them. The trial court had no evidence before it from which it could reasonably conclude that the “false positive” test result was anything other than meaningless, from a scientific viewpoint. Thus, there was no evidentiary basis to support the trial court’s finding that the evidence of the “false positive” test result was “material,” in the sense that it could assist another jury by shedding light on the issue of the cause of the Seymores’ deaths. Furthermore, without some evidence calling into question the correctness of Dr. Middleberg’s assessment of the “false positive” test result, the trial court had no evidentiary basis for concluding that the “false positive” result was substantive evidence that the Seymores had died of carbon monoxide poisoning. The evidence would possibly have been useful to the plaintiffs for impeachment purposes when cross-examining Dr. Middleberg; however, under our case law, a new trial is not warranted if the newly discovered evidence is useful only for impeachment purposes. Finally, the uncontradicted nature of Dr. Mid-dleberg’s testimony with respect to the “false positive” test result foreclosed the finding by the trial court that the evidence of that result would probably cause a different jury to reach a different verdict if the case were tried again. Another jury would most certainly be instructed to base its verdict on the evidence and not to speculate as to whether the “false positive” test result indicated that Ms. Seymore might have had a significant amount of carboxyhemoglobin in her blood at the time of her death. In the absence of other evidence suggesting that Dr. Middle- *232 berg was wrong about the relevance of the “false positive” result, it is not reasonable to conclude that another jury, even if presented with the “false positive” test result, would probably return a verdict for the plaintiffs.
I further note that the majority’s reliance on evidence concerning the manner in which Ms. Shevlin stored the Seymores’ blood samples is misplaced. (In fact, the plaintiffs do not even argue this particular issue in their brief. The plaintiffs argue that the “false positive” test result was the newly discovered evidence that required a new trial.) As noted, I can find no evidence in the record critical of the manner in which the blood samples were received, tested, and stored by Ms. Shevlin (other than Dr. Burton’s affidavit, which was submitted after the trial in support of the new trial motion). Even Dr. Burton testified during the trial as follows:
“Q. As I understand your testimony to the ladies and gentlemen of the jury, it’s your opinion that the Seymores died of carbon monoxide asphyxiation?
“A. Yes, sir.
“Q. And it is your opinion, despite the evidence that there is negative CO returned by Laura Shevlin from the Alabama Forensic Laboratory?
“A. Yes, sir. I fully appreciate the fact that more than one test was done on the samples and they were all negative.
“Q. And you, in fact, don’t know of anything wrong with the way any of those tests were done; do you?
“A. I don’t, no, sir.
“Q. And you don’t know [of] anything wrong with any of the chain of custody in any of those cases; do you?
“A. No, sir.
“Q. In fact, you can’t criticize the way in which Dr. Stillwell drew his test samples; can you?
“A. I’m not criticizing either Dr. Still-well, the lab, or anything else, no, sir.
“Q. They just don’t add up, in your opinion?
“A. That’s right.”
Any inquiry as to whether the test results that were obtained by Ms. Shevlin, or those that were later obtained by Dr. Middleberg, could have been distorted as the result of the manner in which the blood samples were stored at the Alabama Department of Forensic Sciences, could have, and should have, been made before the trial. All the people responsible for collecting, handling, and testing the Seymores’ blood samples were known to the plaintiffs before the trial. Although the plaintiffs’ attorney was notified of Dr. Middleberg’s test results only two days before the trial, the record quite clearly shows that the defendants’ attorney offered to delay the trial so that the plaintiffs could adequately explore the importance of the new test results. The plaintiffs’ attorney declined this offer on the ground that he believed the new test results, which showed the presence of low levels of carbon monoxide in the Sey-mores’ blood, actually supported the plaintiffs’ theory of the case. Thus, the plaintiffs proceeded to trial after making a conscious, tactical decision that they did not need to explore any issue concerning whether the test results obtained by either Ms. Shevlin or Dr. Middleberg could have been skewed by the manner in which Ms. Shevlin had stored the blood samples. Simply put, the evidence concerning the manner in which Ms. Shevlin stored the Seymores’ blood after she had received and initially tested it was not newly discovered evidence. Evidence is not newly discovered if, through the exercise of due diligence, it could have been discovered before the trial. Weeks v. Danford, supra.
Based on the above, I would hold that the trial court’s order granting the plaintiffs a new trial, lacking, as it does, an evidentiary foundation, is plainly and palpably wrong; therefore, I would reverse and remand.
HOOPER, C. J., and MADDOX and BUTTS, JJ., concur.

On Application for Rehearing

COOK, Justice.
APPLICATION OVERRULED; OPINION MODIFIED.
ALMON, SHORES, KENNEDY, and INGRAM, JJ., concur.
HOOPER, C.J., and MADDOX, HOUSTON, and BUTTS, JJ., dissent.

. Carbon monoxide is a gas. When inhaled, it bonds much more easily with a person's hemoglobin (the oxygen-carrying cells in the blood) than oxygen does. The bonding of the carbon monoxide with the hemoglobin produces carbox-yhemoglobin. Thus, the tests conducted by Ms. Shevlin were for the purpose of detecting carbox-yhemoglobin.

. Ms. Shevlin reserved the other half of her samples for the plaintiffs in the event that they also made such a request. The plaintiffs contacted the director of the Alabama Department of Forensic Sciences, who erroneously informed them that there was no additional blood left for testing. The plaintiffs never contacted Ms. Shevlin. Thus, the plaintiffs had no independent tests run on the remainder of the Seymores' blood samples before the trial.

. The plaintiffs submitted an affidavit from Dr. Burton.